**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| Walter Almond | * |
| 4860 Eisenhower Ave | * |
| Unit 291 | * |
| Alexandria, VA 22304 | * |
| | * |
| *Plaintiff*, | * |
| | * |
| | *    **Case No.:** |
| | * |
| v. | * |
| | * |
| | * |
| Broadleaf, Inc. | *    **JURY TRIAL DEMANDED** |
| | * |
| *Defendant*. | * |
| | * |
| Serve: | * |
| | * |
| | * |
| Broadleaf, Inc. | * |
| 9720 Capital Ct | * |
| Suite 201 | * |
| Manassas, VA 20110 | * |
| | * |
| | * |
| | * |

---

## COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES

COMES NOW, Plaintiff, Walter Almond (hereinafter "Plaintiff" or "Mr. Almond"), by and through his undersigned counsel Dionna Maria Lewis, Esq. and Andrew Clarke, complains against Defendant, Broadleaf, Inc. (hereinafter "Defendant" or "Broadleaf") and in support thereof states as follows:

## INTRODUCTION

1.    This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. ("Title VII"); the Americans with Disabilities Act of 1990

1

42 U.S.C. § 12101 *et seq.* ("ADA"); and the Age Discrimination in Employment Act of 1967 29 U.S.C. § 621 *et seq.* ("ADEA") for the Defendant's unlawful actions based on race, age (over 40), disability (mental and physical: orthopedic), reprisal (prior and current participation in protected EEO activity), and that he was subjected to harassment and a hostile work environment.

## JURISDICTION AND VENUE

2.  This Honorable Court possesses original jurisdiction over Plaintiff's civil action by operation of 28 U.S.C. § 1331, as it asserts a claim that arises under the Constitution, laws or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, the ADA, and ADEA, to redress and enjoin employment practices of the Defendant.

3.  Venue is proper pursuant to 28 U.S.C. § 1391 in the Eastern District of Virginia because all or a substantial part of the events or omissions on which the claims herein are based occurred there.

## EXHAUSTION OF REMEDIES

4.  Plaintiff has exhausted all of his administrative remedies.

5.  Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on August 24, 2022, alleging discrimination based on race, age (over 40), disability (mental and physical:), reprisal (prior and current participation in protected EEO activity), and that he was subjected to harassment and a hostile work environment.

6.  On November 9, 2022, Plaintiff received notice through email from the EEOC, informing Plaintiff that a Final Agency Decision ("FAD") had been issued dismissing the Complaint, and informing Plaintiff of his right to file a civil action within 90 calendar days of receipt of the FAD.

7.   Accordingly, Plaintiff timely files this action in accordance with the EEOC's notice, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the decision.

## NATURE OF THE ACTION

8.   Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

9.   Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, permanent removal from career field without cause, emotional tranquility, physical and mental pain and suffering, and denial of his statutory rights.

10.  The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

11.  Plaintiff, Mr. Walter Almond, is an adult male who resides in Alexandria, Virginia.

12.  Defendant is a corporation, which is headquartered in Manassas, VA, where all or a substantial part of the events or omissions on which the claims herein are based took place.

13.  During the relevant period, the Defendant employed the Plaintiff Mr. Almond.

14.  During the relevant period, Plaintiff was Defendant's employee within the meaning and entitled to the protections of Title VII, the ADA, and ADEA.

## FACTUAL ALLEGATIONS

15.  Plaintiff contends that the Agency discriminated against him based on her race, age, disability, reprisal, and subjected him to a hostile work environment and harassment.

16. Plaintiff is a seasoned cybersecurity employee with previous experience as the owner of Strac Software Solutions Inc ("SSS") that was subcontracted to CKA LLC on various cybersecurity projects.

17. On or around early 2019, SSS and other small businesses collaborated with CKA on numerous Requests for Information (RFI) and Requests for Proposal (RFP). One of the RFP's was the Command-and-Control Support Agency (CCSA) Cybersecurity Support Services (CSSS) RFP.

18. Plaintiff allowed CKA to use his resume in the proposal for the CSSS contract and CKA partnered with Defendant to win the contract. CKA and Defendant combined to fill the positions on the contract. Subsequently, CKA offered Plaintiff a variety of positions including, Cyber Operations Engineer, Configuration Manager, Configuration Engineer) as a W2 employee, but Plaintiff declined.

19. In or around August 2019 timeframe, Plaintiff was contacted by Todd Cowing, Account Executive-Business Development, for Defendant regarding a Software Compliance Analyst position. Plaintiff has an extensive background in software development, cybersecurity testing and evaluation, static application security testing, and other cybersecurity processes and procedures with other similar organizations. As such, Plaintiff accepted the position.

20. On or about September 9, 2019, Plaintiff was hired by Defendant in the position of Software Compliant Analyst at the Pentagon for the Command-and-Control Support Agency (CCSA).

21. The position description as taken from the Performance Work Statement (PWS):

- Software Compliance Analyst: Shall work hands-on with development teams to develop, roll-out, and provide oversight for a comprehensive

Secure Software Development Life Cycle (SSDLC) program, including secure coding guidelines and static code analysis. Contributes to raise the application security posture across the organization, by developing an application security framework, including SSDLC development standards and guidelines for application developers; assisting the development teams identify application security vulnerabilities through a combination of security assessment techniques.

- Key duties: Manages and maintains the Secure Software Development Life Cycle (SSDLC) performing static and dynamic code analysis across multiple coding languages; Vulnerability Scanning.

22.  Successful implementation of the Secure Software Development Life Cycle (SSDLC) described in the job description would be for the Software Compliance Analyst to manage the people, processes, and procedures (PPP) to objectively evaluate all developmental systems/software engineering activities and artifacts to ensure their compliance with overarching cybersecurity laws, executive orders, directives, standards, best practices, and lessons learned.

23.  At the time of his hire, Plaintiff suffered from various orthopedic and nerve disabilities as a result of his military service.  These disabilities included: lumbar strain with degenerative arthritis and intervertebral disc syndrome (IVDS), obstructive sleep apnea with asthma, right shoulder strain, right ankle sprain, left wrist sprain, right knee strain with arthritis, left knee strain with arthritis, left shoulder strain with rotator cuff tendonitis, left ankle sprain, right wrist sprain.

24.  Due to his medical conditions, Plaintiff requires accommodations to ease his mobility and strain on his orthopedic disabilities.  Plaintiff suffers from chronic pain in his shoulder, back, and lower extremities.  Overexertion, prolonged sitting, and poor lumbar support exacerbates the pain and causes swelling in his joints.

25. Because of his debilitating medical conditions, Plaintiff is prescribed various medications. Plaintiff is prescribed eighteen (18) different medications and treatments that include topical ointments, Gabapentin, Albuterol, Methocarbamol, and Cyclobenzaprine.

26. Due to his chronic and debilitating medical conditions, medications, and extensive treatment and home remedies required as described above, Plaintiff sought and requested a reasonable accommodation, from Mr. Shawn Crivello upon his hiring with Broadleaf.

27. The request was for a parking space and a workable chair because of the strain and pain on his joints. Working onsite at the Pentagon required Plaintiff to commute via Metro. The closes Metro station is approximately one (1) mile from Plaintiff's residence. Plaintiff would then have to walk a mile from the Pentagon Metro station to his office. In or around November 2019, Plaintiff began to experience significant mobility problems due to the amount of walking and his office chain not providing sufficient lumbar support. These problems caused Plaintiff extreme pain and discomfort.

28. Plaintiff informed Mr. Crivello about the swelling in his knees and informed him that his orthopedic pain was being exacerbated. Mr. Crivello suggested that Plaintiff find a carpool that he could join to obtain a parking spot in the carpool area. Plaintiff stated that he did not feel comfortable lying about why he needed a parking space and that he would still require an accommodation for the workable chair. Mr. Crivello stated that he would look into it, but Plaintiff did not receive a definitive answer regarding these items. Plaintiff began to feel disregarded in terms of his needs but he hoped that he would soon be able to receive his accommodations.

29.    Plaintiff continued to reach out to Mr. Crivello every week since November 2019. Ultimately however, due to the COVID-19 pandemic, Plaintiff and his team were placed on maximum telework in or around March 2020.

30.    The CSSS contract allotted for 15 key personnel with varying degrees of education, certifications, and experience to increase the cybersecurity posture of CCSA.  As such, some of the personnel would work in the development environment and others would work in the production environment (operations). However, Plaintiff was the only person working in the development environment to ensure that the agency's software application portfolio and other deliverables were compliant with overarching guidance, laws, executive orders (EO), National Institute of Standards and Technology (NIST) publications, Department of Defense (DoD) Instructions, policies and procedures.

31.    To successfully implement the SSDLC, Plaintiff performed all the standard cybersecurity, software/system engineering, and project management processes.  Plaintiff worked with the development and system administration teams to develop processes and procedures that tested and evaluated the compliance and hardness of the software applications under the control of the CCSA.  This included assessing various software and providing input on the status of the software.

32.    In the course of his duties, Plaintiff soon began to notice that many software files had irregularities that indicated that there were fundamental problems with the scan process and the source code being scanned.  Almost all assessment reports identified these irregularities and as a result, Plaintiff made recommendations on the course of action to correct them.  Corresponding meetings were held with government, military, contractor

development and system administration teams to discuss the assessment reports and the process refinements. On average, approximately three meetings were held weekly.

33.    In these meetings, the development team personnel became increasingly contentious, hostile, and abusive towards Plaintiff. The development teams consisted of the Technical Services Division (TSD), National Guard Bureau (NGB), and contractors. There were approximately 30 - 50 personnel who represented the development team during these meetings.

34.    The individuals in the meetings, namely Ellen Corrathers and Ron Schultz, began to harass Plaintiff as to his negative assessments, notification of issues and subsequent recommendations. During the meetings, the entire team would proceed to follow Ms. Corrathers and Mr. Schultz and began to become confrontational and unwilling to accept any of Plaintiff's recommendations to mitigate identified issues. Plaintiff was often pressured to change his assessments so as to give the software a more positive view however when Plaintiff refused, he was often told that he was wasting their time and that they could "get someone else to do it." Plaintiff was routinely subjected to the abusive, intimidating, and offensive tone of the assessment meetings multiple times a week. This behavior made it impossible for Plaintiff to successfully implement the SSDLC processes and procedures.

35.    During each meeting, Plaintiff was degraded and embarrassed as a result of the harassment. Ms. Corrathers and Mr. Schultz constantly made statements that they were going to "get rid" of Plaintiff or that they had "had enough of this" in regard to Plaintiff's recommendations. Eventually, Plaintiff became fearful of the constant threats and pressure he faced as a result of him simply doing his job.

36. Plaintiff informed his government supervisors, Duleep Sahi and Colten O'Malley, of the harassment which they then reported to their supervisors. However, nothing came of the complaints and eventually his government supervisors stopped concerning themselves with the harassment. Plaintiff felt alone and disregarded due to the harassment that he was forced to endure with no reprieve.

37. Plaintiff was consistently targeted during his assessments despite the fact that Plaintiff was not the only individual who was reporting issues in cybersecurity. Mr. Jason Gilson (Caucasian), Incident Response Handler, would identify and evaluate when there was a spillage of classified information and provide mitigation and prevention recommendations.

38. Government and military personnel did not subject Mr. Gilson to the same treatment as Plaintiff. Mr. Gilson was supported on his recommendations and had direct access to Col. Campfield during these incidents.

39. Various other personnel also received support when they identified issues or weaknesses. Plaintiff was the only individual who was subjected to such harassment and vitriol as a result of his performing his job duty of identifying weaknesses, vulnerabilities, non-compliance, and shortcomings in the software assets.

40. Plaintiff's recommendations for resolving issues and making the processes, procedures, and deliverables compliant with overarching guidance were not only ignored but resulted in even more harassment because of the recommendations. Plaintiff's government supervisors would demean and pressure Plaintiff to change his assessments. Plaintiff was made to feel fearful if he did not.

41. Plaintiff complained about the harassment to his government supervisors, Christina Grinvalsky and Mr. Crivello, who was in attendance to numerous of the meetings. Mr.

Crivello acknowledged that the treatment was improper, but did nothing to stop the harassment. In fact, after Plaintiff reported the harassment to Ms. Grinvalsky and Mr. Crivello, the harassment only seemed to worsen.

42. As a result of the contentious meetings and harassment he faced, Plaintiff began to work to find a new, more understandable way to share information.  At the beginning of Plaintiff's tenure there were numerous versions of the workflow processes identifying the SSDLC with input from all stakeholders, and so Plaintiff and his team used the common elements to create a standard process flow for the SSDLC as a way to ease understanding regarding any potential issues with software. All stakeholders approved of the final document, and it was to be submitted for the Commander, Col. Chad Campfield, to sign in or around December 2019.

43. Plaintiff delivered the finished product to Colten O'Malley who stated that he was submitting it for Col. Campfield's signature on December 10, 2019.

44. A few weeks later, in or around February 2020, Col. Campfield verbally asked Plaintiff about the documents.

45. On or about April 19, 2020, Col. Campfield again inquired about the SSDLC via email to Mr. O'Malley on which Plaintiff was copied.  Having assumed that the document had not been received, Plaintiff sent the same version of the document to Col. Campfield that Plaintiff had delivered to Mr. O'Malley.

46. This was common practice as Col. Campfield would reach out to the Division Chief and the responsible person in the division would address the request.  Despite this, Mr. O'Malley requested that Plaintiff be reprimanded on the basis of his email to Col. Campfield as it was "inappropriate."

47.    At this time, Plaintiff was unaware of any issue with his email.  It was not until *after* Plaintiff had had yet another meeting on or about May 6, 2020, informing his supervisors of the harassment he faced that he was informed of the reprimand and placed on a Performance Improvement Plan.  During the meeting, Plaintiff Human Resources, that if the harassment did not end, he would file a formal complaint of harassment as he was being singled out as a result of his race, age, and disability.

48.    The meeting had once again led to no active change and a mere four hours later, Plaintiff received an email from Mr. Crivello informing him that he had been approached by "team members" who had "deep concern about recent and ongoing actions on [Plaintiff's] part." These actions included emailing Col. Campfield directly on April 19, 2020, bringing up an "unapproved" topic via question at a meeting on May 5, 2020, and emailing a document to a particular mailing list on May 5, 2020.  Mr. Crivello also sent a performance plan along with the email.

49.    Plaintiff found it incredibly suspicious that it was only after he complained about his treatment that Plaintiff was informed about these alleged communication issues.  Despite this, Plaintiff was astounded that these one-off issues would rise to the level of a reprimand and performance plan.  Plaintiff felt that his government supervisors threats were finally coming to fruition so as to interfere with his employment.

50.    Plaintiff requested a meeting regarding the performance plan with HR and HR held a meeting on or about May 8, 2020.  During the meeting, Plaintiff explained what occurred on the three occasions mentioned in the PIP and produced his previous emails submitted to HR.  HR Director, Gayle Higgs, admonished Mr. Crivello and ultimately rescinded the performance plan and reprimand.

51.     Plaintiff was stressed and felt that this was yet another way that he was being singled out as a result of his race, age, and disability and his complaints regarding the harassment.

52.     Despite Broadleaf's rescission of Plaintiff's PIP, Plaintiff was constructively demoted as a result of the HR action.  Mr. Crivello replaced Ms. Grinvalsky as Plaintiff's supervisor despite Plaintiff having previously reported to more senior level management.  Mr. Crivello did not have the knowledge or skills related to the inputs, outputs, processes, and procedures needed to manage Plaintiff's work because he worked in operations and not development.   As a result, the entire process resulted in a severely hampered implementation of software processes.

53.     The harassment increased as Plaintiff was directed to performed meaningless tasks as punishment by Ms. Corrathers and Mr. Schultz, even though Plaintiff was a contractor employee and performing the assessment/evaluation.  These sort of tasks included creating additional documents that identified why cybersecurity needed to be implemented in software engineering activities despite the fact that various laws, executive orders, DoD directives and instructions that stated that such processes were required.  Also, making parts of the development testing duties part of the cybersecurity evaluation; sending the specific file to development personnel, upload files to the server, creating projects on the server.   These requests were coming from a development team of approximately 50 personnel and took away from Plaintiff performing the duties of the Software Compliance Analyst.

54.     Additionally, since the beginning of his employments and more so after the PIP incident, Plaintiff was not given the appropriate permissions to make changes on applications and tools that needed reconfiguration.  Plaintiff was the only person implementing the SSDLC

process and thus receiving the source code was mandatory for Plaintiff to be able to provide an effective cybersecurity test and evaluation. Various other members on the team, such as Aubrie Mason Hyde (Caucausian), were allowed the permissions despite the fact that the permissions were necessary for Plaintiff's work.

55. Prior to the PIP issue, Plaintiff had communicated about his career growth potential with Mr. Todd Cowing at the time of his hiring. Mr. Cowing and Plaintiff had discussed how Plaintiff's position should have been a management position as it required the most experience and education for each position on the CSSS contract. After the PIP issue, Plaintiff no longer was contacted about potential positions changes and growth.

56. After the PIP issue, Ms. Corrathers, Mr. Schultz, and Mr. O'Malley began to change Plaintiff's hours to coincide with personnel in different time zones, requested that Plaintiff be forced to go onsite for meetings, required Plaintiff to create training documents that were out of scope of his duties, assist other contractors to rewrite source code and required Plaintiff to perform the development team's administrative duties.

57. Plaintiff was forced to endure consistent harassment at meetings, a lack of access to permissions needed to complete his duties, being required to perform random tasks outside of the scope of his duties, and changes in his schedule for almost two (2) years. At no point did Defendant or its agents address the issues of harassment and disparate treatment despite Plaintiff's begging and pleading for changes to be made.

58. Despite the constant harassment, Plaintiff consistently received commendations for his performance. Plaintiff received emails from Mr. Duleep Sahi and Mr. Crivello commending Plaintiff for his work and proficiency. Further, Plaintiff received a pay increase in or around January 2022.

59.    In or around late 2021 and early 2022, the applications began to exhibit serious technical concerns such as going offline, data corruption, interfaces not working, etc., as a result of no changes being made as a result of Plaintiff's recommendations.

60.    During one of the assessment meetings on or about March 24, 2022, Plaintiff could no longer tolerate the harassment and requested that Ms. Corrathers advise the new Commander, Col. Michael Smith, of the harassment that was happening during the meetings.

61.    Ms. Corrathers scheduled a follow up meeting on or about March 28, 2022, where she invited the Division Chief LTC Burchell Porter. Mr. Porter asked Plaintiff what he wanted to convey to Col. Smith and Plaintiff explained that he believed that it was unreasonable for me to be harassed during the meetings as no other cybersecurity personnel were subjected to such treatment.

62.    While working for Broadleaf, Plaintiff experienced numerous stress-related symptoms with the main one being the inability to sleep because of the harassment. Plaintiff soon visited his primary doctor and informed him about the work conditions and symptoms. Plaintiff's doctor suggested that Plaintiff speak with a psychologist and made a referral. After having numerous sessions with the psychologist, Plaintiff was diagnosed with Anxiety and Depression.

63.    As a result of further aggravation of his disabilities and his newly diagnosed anxiety and depression, Plaintiff continued to request reasonable accommodations.  Yet again, Plaintiff received no response in regard to his previous orthopedic accommodations request or his new requests.

64.    On or about March 29, 2022, Plaintiff could not tolerate the harassment anymore and asked for the reasonable accommodation and harassment issues to be escalated to higher level leadership at CCSA and Broadleaf. Mr. Crivello sent an email identifying the issues, as he understood them, requesting a meeting with Jon Geronimo, Director, Engineering Programs, and William Erdman, Vice President.

65.    The meeting took place on or about March 30, 2022, where the leadership was advised of the accommodation and harassment issues. The outcome was that Mr. Crivello should meet with Mr. O'Malley at CCSA to resolve these issues and Broadleaf HR would provide paperwork for a reasonable accommodation.

66.    The Reasonable Accommodation packet consisted of the following three documents: Employee ADA Medical Certification, Reasonable Accommodation Request Form, and a Physical Demands Worksheet. The ADA Medical Certification is required to be completed by a doctor after examination of the disability and in conjunction with a vocational rehabilitation counselor after evaluation of each disability. However, before Plaintiff could complete the reasonable accommodations process, Plaintiff would be terminated.

67.    On or about April 22, 2022, Plaintiff received a call from Mr. Geronimo and Mr. Crivello advising that it was Plaintiff's last day on the contract and subsequently the last day of employment with Broadleaf. No reason was given except that Plaintiff's employment was "At-Will".

68.    A few days later, Plaintiff received a letter as an email attachment from Gayle Higgs, HR Manager, stating that he was terminated as of Friday, April 22, 2022.

69.    Plaintiff never had any performance or disciplinary issues during his employment with Broadleaf. To the contrary, Plaintiff was sought out to advise on or research new, time

sensitive requirements. Government, military, and contractor personnel regularly took the content from Plaintiff's deliverables and used them as their own.

70.  Only after Plaintiff was terminated was there any mention of dissatisfaction or issues with his performance. Except for the rescinded PIP, Plaintiff was never counseled, written up or otherwise reprimanded during his entire employment with Broadleaf. None of the statements from Broadleaf that disparaged Plaintiff's performance provided specific examples or instances.

71.  As a result of his involuntary termination, Plaintiff has struggled to obtain employment at his level of expertise due to the stain that termination has left on his resume. The unwarranted HR actions taken by Broadleaf have severely hampered Plaintiff's future employment options and marketability.

72.  The discrimination and severe punishment Plaintiff experienced are an unequivocal demonstration of discriminatory and disproportionate treatment of him as an older disabled Black man, particularly when comparing his treatment and punishment to his similarly situated non-disabled, non-Black and younger colleagues, and of retaliation against him as an employee who engaged in statutorily-protected activity.

73.  The Defendant's discriminatory practices have been effectuated in violation of federal and state statutes, including Title VII of the Civil Rights Act, the ADA, and the ADEA.

## <u>COUNT I</u>

### VIOLATION OF TITLE VII - RACE DISCRIMINATION

74.  Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

75.    A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

76.    Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is Black and is considered a member of a protected class pursuant to Title VII of the Civil Rights Act of 1964. Plaintiff is a qualified employee and suffered an adverse employment action directly related to his membership in a protected class pursuant to Title VII, when he was involuntarily terminated.  Finally, Plaintiff has identified non-Black similarly-situated employees of Defendant who were treated more favorably than Plaintiff, giving rise to an inference of disparate treatment.

77.    The work environment and adverse action that Plaintiff was subjected to materially affected the terms, privileges, and conditions of his employment.

78.    Defendant knew that Plaintiff was Black prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of his race.

79.    Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to his race.

80.    Defendant treated Plaintiff in a way that deprived his of workplace safety and otherwise adversely affected his status as an employee because of his race.

81.    Similarly situated non-Black employees have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and his workplace conditions.

82.    Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

83. Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

84. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

85. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his race.

86. Defendant discriminated against Plaintiff because of his race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

87. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

88. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, and costs – and is entitled to all available legal and equitable remedies.

89. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

90. Further, Defendant's treatment and actions are ongoing.

91. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

92. Similarly situated non-Black employees were not subjected to the same, similar, or any adverse treatment as Plaintiff.

93.   By law, Broadleaf Inc., must comply with Title VII, but through their conduct have violated Title VII.

## COUNT II

**VIOLATION OF TITLE VII – HOSTILE WORK ENVIRONMENT**

94.   Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

95.   When hostile work environment is alleged to have occurred as a result of unlawful discrimination, the Complainant must show that: (1) he belongs to a statutorily protected class; (2) he was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on his statutorily protected class; (4) the harassment affected a term or condition of employment[1] and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21 (1993).

96.   Here, the five (5) elements of a *prima facie* case of a hostile work environment are met. The Plaintiff belongs to a statutorily protected class as a Black man over the age of 40. The Plaintiff was subjected to harassment in the form of disciplinary action and harassment, ultimately culminating in involuntary termination. There is a basis for imputing liability,

---

[1] The phrase "terms, conditions and privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

where Broadleaf subjected the Plaintiff to the above-mentioned harassment, because of his statutorily protected class as a Black man over the age of 40.

97.     The actions and conduct of the Defendant as set forth herein created a hostile, offensive, and intimidating work environment and detrimentally affected Plaintiff.

98.     The actions and conduct by the Defendant as set forth herein were severe, hostile, and pervasive and constituted discrimination based on race and age.

99.     The actions and conduct described herein would have detrimentally affected a reasonable person of the same race and age in Plaintiff's position.

100.    Defendant knew or should have known of the hostile work environment described herein. Defendant has failed to address the problems and further failed to implement effective and appropriate measures to stop the hostile work environment.

101.    By failing to protect Plaintiff within his work environment; and by allowing for younger, Caucasian employees to receive more favorable treatment than Plaintiff in the terms and conditions of employment, Defendant exacerbated the hostile work environment suffered by Plaintiff, and intentionally discriminated against Plaintiff in violation of Title VII.

102.    Defendant's actions, and failure to act, amounted to discrimination based on race and age under Title VII and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment abrogates the states' Eleventh Amendment sovereign immunity. Title VII, through the 1972 amendment known as the Equal Employment Opportunity Act ("EEOA"), provides an enforcement remedy for equal protection violations of state employees through Section 5 of the Fourteenth Amendment.

103. As a direct result of Defendant's above-mentioned unlawful acts, Plaintiff has suffered damages, including but not limited to lost wages and emotional and mental distress.

## COUNT III

### VIOLATION OF THE ADEA - AGE DISCRIMINATION

104. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

105. The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The plaintiff "must prove, with reasonable probability, that but for the age of the plaintiff, the employment decision adverse to the plaintiff would not have been made." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991).

106. A *prima facie* case of age discrimination requires a showing of four (4) elements: that he (1) was protected by the ADEA, (2) suffered an adverse employment action, (3) "was performing his job at a level that met his employer's legitimate expectations" at "the time of the adverse employment action, and (4) was replaced by a substantially younger worker. *Ullrich v. CEXEC, Inc.*, 233 F. Supp. 3d 515, 525 (E.D. Va. 2017).

107. Here, the four (4) elements of a *prima facie* case of age discrimination are met. The Plaintiff is over forty years old and is considered a member of a protected class pursuant to the ADEA. Plaintiff is a qualified employee and suffered an adverse employment action directly related to his membership in a protected class pursuant to the ADEA, when he was involuntarily terminated.  Finally, Plaintiff has identified younger similarly-situated

employees of Defendant who were treated more favorably than Plaintiff, giving rise to an inference of disparate treatment.

108.   The work environment and adverse action that Plaintiff was subjected to materially affected the terms, privileges, and conditions of his employment.

109.   Defendant knew that Plaintiff was over the age of 40 prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of his age.

110.   Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to his age.

111.   Defendant treated Plaintiff in a way that adversely affected his status as an employee because of his age.

112.   Similarly situated younger employees have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and his workplace conditions.

113.   Plaintiff's age was a determining factor in Defendant's unlawful conduct toward Plaintiff.

114.   Plaintiff's age was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

115.   The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

116.   Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his age.

117.   Defendant discriminated against Plaintiff because of his age by engaging in, tolerating, or failing to prevent age discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

118. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

119. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, and costs – and is entitled to all available legal and equitable remedies.

120. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

121. Further, Defendant's treatment and actions are ongoing.

122. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

123. Similarly situated younger employees were not subjected to the same, similar, or any adverse treatment as Plaintiff.

124. By law, Broadleaf Inc., must comply with the ADEA, but through its conduct has violated the ADEA.

## COUNT IV

## VIOLATION OF TITLE VII – RETALIATION

125. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

126. Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [his] compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e–3(a). To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

127. Here, the Plaintiff faced retaliation for his prior EEOC activities, as Defendant continuously harassed him when he would seek reprieve from the disparate treatment.

128. Defendant subjected Plaintiff to the aforementioned adverse employment actions because of his protected activities in violation of Title VII.

129. Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEOC representative, or otherwise should have known that Plaintiff had filed EEOC charges.

130. The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

131. Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

132. Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

133. Similarly situated younger, non-Black employees were not subjected to the same, similar, or any adverse treatment.

134. Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of Title VII.

135.    Defendant's actions were intentional, reckless, and malicious.

136.    The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

137.    Defendant's unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment.

138.    Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation in protected activities.

139.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

140.    Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature. Further, Defendant's treatment and actions are ongoing.

141.    As a direct and proximate cause of Defendant's conduct alleged throughout this complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages—including but not limited to past and future loss of income, benefits, and career opportunities—and is entitled to all available legal and equitable remedies.

142.    Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.

143.    Broadleaf, Inc., must comply with Title VII, and by and through its conduct, has violated the law.

## COUNT V

### DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA/ADAA")

144. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

145. The ADA prohibits discrimination based on disability. *See* 42 U.S.C. § 12101 et seq. The ADA requires that covered employers to provide reasonable accommodations to employees with disabilities.

146. The Defendant was aware of Plaintiff's medical complications and his disability status and did not provide reasonable accommodations, namely Plaintiff's request for a parking spot and a workable chair thereby violating Plaintiff's rights under the ADA.

147. The Defendant used this disability status to harass, demean, degrade, and humiliate the Plaintiff.

148. The Plaintiff has suffered irreparable harm and injury as a result of this unlawful misconduct.

149. Broadleaf, Inc. must comply with the ADA, and by and through their conduct, violated the law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Mr. Walter Almond, respectfully prays that this Court grant him the following relief:

a. Enter a declaratory judgement finding that the foregoing actions of Defendant violated Title VII, the ADA, and ADEA;

b.  Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c.  Award compensatory damages in the amount of $500,000.00 (five hundred and thousand dollars and zero cents) that would fully compensate Plaintiff for the physical and mental injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendant alleged herein;

d.  Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e.  Order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: February 6, 2023

Respectfully submitted,

**/s/ Andrew O'Clarke**
_____

Andrew O. Clarke, Esq.
A. Clarke Law, PLLC
163 Waterfront Street, Suite 440
National Harbor, MD 20745

Dionna Maria Lewis, Esq.
(*Pro Hac Motion to Be Submitte*d)
District Legal Group, PLLC
Bar No. 219016
700 Pennsylvania Ave, SE, Suite 2098
Washington, D.C. 20003

Phone: (202) 486-3478
Dionna@DistrictLegalGroup.com

*Counsel for Plaintiff Walter Almond*